Bradshaw v. Maiden, 2020 NCBC 60A.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

JAMES W. BRADSHAW; CARLA O. BRADSHAW; RESORT RETAIL ASSOCIATES, INC.; E.C. BROADFOOT; CHRISTINA DUNN CHANDRA; THOMAS F. EGAN; CHARLES EGGERT; MARK P. GARSIDE; DR. JAMES J. GREEN, JR.; ROBERT K. GRUNEWALD; RONALD HOLMES; DAVID LAUCK; CURT W. LEMKAU, JR.; EVAN MIDDLETON; JOSHUA M. NELSON; CHRISTIAN C. NUGENT; REGINA H. PAKRADOONI, as Executrix of the Estate of PETER B. PAKRADOONI, deceased; FORD PERRY; MARCELLO G. PORCELLI; ADAN RENDON; RICHARD H. STEVENSON; PAUL STOKES; LAWRENCE J. THEIL; R. MITCHELL WICKHAM; WILLIAM H. WILLIAMSON, III; WILLIAM K. WRIGHT, JR.; ALEX M. WOLF; CHAFFIN FAMILY LIMITED PARTNERSHIP; and SOLARIS CAPITAL LLC,

    Plaintiffs,

v.

STEPHEN E. MAIDEN; MAIDEN CAPITAL, LLC; and SS&C TECHNOLOGIES, INC., successor by merger to SS&C FUND ADMINISTRATION SERVICES, LLC (a/k/a SS&C FUND SERVICES),

    Defendants.

SS&C TECHNOLOGIES, INC., successor by merger to SS&C FUND ADMINISTRATION SERVICES, LLC,

    Third-Party Plaintiff,

v.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 14445

**AMENDED ORDER AND OPINION ON DEFENDANT SS&C TECHNOLOGIES, INC.'S MOTION FOR SUMMARY JUDGMENT**

MAIDEN CAPITAL OPPORTUNITY
FUND, LP,

        Third-Party Defendant.

1.    **THIS MATTER** is before the Court upon Defendant SS&C Technologies, Inc.'s ("SS&C") Motion for Summary Judgment (the "Motion") filed on October 28, 2019 in the above-captioned case. (ECF No. 256.)

2.    After considering the Motion, the briefs and related materials submitted in support of and in opposition to the Motion, the arguments of counsel at the hearing on the Motion, and other appropriate matters of record, the Court **GRANTS** the Motion and **DISMISSES** Plaintiffs' remaining claims against SS&C with prejudice.

*Mauney PLLC, by Gary V. Mauney, and Lewis & Roberts, PLLC, by James A. Roberts, for James W. Bradshaw; Carla O. Bradshaw; Resort Retail Associates, Inc.; E. C. Broadfoot; Christina Dunn Chandra; Thomas F. Egan; Charles Eggert; Mark P. Garside; Dr. James J. Green, Jr.; Robert K. Grunewald; Ronald Holmes; David Lauck; Curt W. Lemkau, Jr.; Evan Middleton; Joshua M. Nelson; Christian C. Nugent; Regina H. Pakradooni, as Executrix of the Estate of Peter B. Pakradooni, deceased; Ford Perry; Marcello G. Porcelli; Adan Rendon; Richard H. Stevenson; Paul Stokes; Lawrence J. Theil; R. Mitchell Wickham; William H. Williamson, III; William K. Wright, Jr.; Alex M. Wolf; Chaffin Family Limited Partnership; and Solaris Capital LLC.*

*Alston & Bird LLP, by Michael A. Kaeding and Ryan P. Etheridge, and Paul Weiss Rifkind Wharton & Garrison, LLP, by Jeffrey Recher and Jack Baughman, for Defendant SS&C Technologies, Inc.*

Bledsoe, Chief Judge.

I.

FACTUAL BACKGROUND

3.      "Although findings of fact are not necessary on a motion for summary judgment, it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue and which justify entry of judgment." *Collier v. Collier*, 204 N.C. App. 160, 161–62, 693 S.E.2d 250, 252 (2010).  Therefore, the Court recites here only the undisputed facts necessary to decide the Motion.

4.      This case arises out of the demise of the Maiden Capital Opportunity Fund, LP (the "Fund"), a "friends and family" hedge fund managed exclusively by Maiden Capital, LLC ("Maiden Capital").  Stephen E. Maiden ("Maiden") was the managing member of Maiden Capital, and Maiden Capital was the general partner of the Fund.  (S*ee* Ex. C, at 1, ECF No. 347.3.)  Maiden eventually pleaded guilty in federal court to operating a multi-million dollar "Ponzi scheme" through the Fund that caused significant losses to Plaintiffs, who were investors in the Fund.  (*See* Ex. K, ECF No. 347.11.)  Maiden was sentenced to seven years' imprisonment for his crimes.  (Ex. K.)

5.      SS&C functioned as the Fund's administrator from 2007 until the Fund collapsed in 2013.  (*See* Ex. D, at 4 [hereinafter "ASA"], ECF No. 347.4.)  Plaintiffs seek recovery from SS&C based on its alleged role in Maiden's fraudulent scheme.  SS&C now asks the Court to enter summary judgment against Plaintiffs on all claims.

6. The relevant undisputed facts are straightforward. In soliciting Plaintiffs' investments in the Fund, the Fund provided Plaintiffs with a Confidential Private Offering Memorandum (the "Offering Memorandum"), (Ex. B, ECF No. 347.2), and a Limited Partnership Agreement (the "Partnership Agreement"), (Ex. C), (together, the "Offering Documents") before they invested in the Fund. Plaintiffs testified that they reviewed the Offering Documents prior to making their investments. (*See, e.g.*, Ex. R, at 76:16–78:12, 104:1–17, ECF No. 347.18; Ex. S, at 146:5–14, 190:23–191:18, ECF No. 347.19; Ex. T, at 166:6–169:23, 212:12–25, ECF No. 347.20; Ex. U, at 107:25–109:7, 215:4–8, ECF No. 347.21.)

7. The Offering Memorandum stated that Maiden had "exclusive management and control of the business and affairs of the [Fund]." (Ex. B, at 6.) Both Offering Documents emphasized Maiden's exclusive control: the Offering Memorandum stated that Maiden alone had "broad discretion to establish the value of [the Fund's] investments[,]" (Ex. B, at 21), and the Partnership Agreement stated that "[Maiden] [would] determine the manner of valuing all other assets and liabilities[,]" (Ex. C, at 6). Maiden had the authority to adjust values for any Fund securities if he determined "in [his] sole discretion" that an adjustment was warranted. (Ex. C, at 6.) Maiden—and Maiden alone—therefore controlled the valuation of the Fund's investments.

8. In contrast, SS&C's role in the administration of the Fund was minimal. Neither Offering Document assigned any responsibilities to SS&C, and only the Offering Memorandum identified SS&C and its relationship to the Fund, confirming

that SS&C was to act as an "[a]dministrator[.]"  (Ex. B, at 3.)  The Fund engaged SS&C to serve as its administrator pursuant to an Administrative Services Agreement ("ASA").  (ASA 4.)  Like the Offering Documents, the ASA emphasized Maiden's exclusive control of the Fund, stating that "[t]he Management and control of the Fund [was] vested exclusively in [Maiden]" and that Maiden had sole "responsibility for determining the valuation of the Fund's investment portfolio."  (ASA 2.)  The ASA expressly stated that SS&C was not "responsible for determining the valuation of the Fund's investments, and [could] not perform any Management functions or make any Management decisions with regard to the operation of the Fund."  (ASA 1.)  SS&C's mandate was therefore administrative and non-discretionary.

9.    The ASA assigned to SS&C the following eight obligations, which primarily relate to the compilation of financial and administrative information:

- "Preparation of general ledger accounts and trial balances for the Fund including either the download of trades or recordation via journal entry of portfolio information as pre-agreed";

- "Preparation and delivery of investor capital statements on a quarterly basis";

- "Calculation of periodic management fees, performance fees and other periodic amounts payable by the Fund as provided for in the Fund's governing documents";

- "Preparation of economic allocation for investors";

- "Calculation of net asset value for the Fund, as well as performance rates of return";

- "Delivery of reports to the Fund on a monthly basis including NAV reports, performance, trial balance and general ledger reports and reports showing investor capital";

- "Coordination with the Fund's auditors in connection with the Fund's audit"; and

- "[K]eep[ing] at its premises books, records and statements as may be reasonably necessary to document the transactions recorded by [SS&C] on behalf of the Fund."

(ASA 1–2.)

10.    The only provision of the ASA that required SS&C to communicate information directly to Fund investors obligated SS&C to "[p]repar[e] and deliver[ ] . . . investor capital statements on a quarterly basis." (ASA 1.)  To meet this obligation, SS&C collected information on Fund transactions from the Fund's brokerage account and from Maiden himself, recorded this information in the Fund's general ledger, and reconciled the information for further use.  (Ex. I, at 52:7–54:21, ECF No. 347.9; Dep. Testimony Excerpts & Tr. Testimony, Dep. Maryanne Niedfeld 53:21–25 [hereinafter "Niedfeld Dep."], ECF No. 341.)  SS&C then used the information reflected in the general ledger to prepare one-page Statements of Partner's Capital ("Capital Statement(s)").  Each month, these Capital Statements were sent to Maiden for his approval.  Upon Maiden's approval,

they were then distributed to the Fund's investors. (*See* Ex. I, at 45:2–9; Ex. F, at 53:21–55:15, ECF No. 347.6; Ex. V, ECF No. 347.22.)

11. The financial information provided to SS&C and later included in the Capital Statements came solely from Maiden and the third parties he designated. (ASA 1 ("The books and records described below will be based on the information SS&C receive[s] from the Fund or its Management, and from designated third parties which may include the Fund's prime broker, investors, [or] attorneys."); Niedfeld Dep. 52:20–53:25, 291:4–12; Dep. Testimony Excerpts & Tr. Testimony, Dep. Loren Locke 335:3–7 [hereinafter "Locke Dep."].) If the general ledger contained errors, the Capital Statements would likewise contain errors because the information included in the Capital Statements "crosse[d] over" from the general ledger. (Niedfeld Dep. 61:17–62:16.)

12. SS&C did not possess detailed documentation regarding the investments Maiden allegedly made on behalf of the Fund; rather, SS&C relied on Maiden himself as its sole source of information. (*See, e.g.*, Niedfeld Dep. 52:11–53:25, 142:9–13, 148:9–49:3, 177:13–78:8, 216:25–17:6, 290:21–91:12; Dep. Testimony Excerpts & Tr. Testimony, Dep. George Schnell 356:3–12.)

13. The Capital Statements contained a written disclaimer to investors, including Plaintiffs, that the information presented within was "preliminary, unaudited[,] and subject to change[,]" that "[a]ctual results may vary," and that "no representation is made that an investor will or is likely to achieve results similar to those shown." (Ex. A, ECF No. 347.1.)

14. The Partnership Agreement informed investors that SS&C would be "using [Generally Accepted Accounting Principles ('GAAP')] as a guideline" when preparing only two types of documents: (i) "audited financial statements of the performance of the Partnership, including a statement of profit and loss, prepared by the Partnership's auditors, promptly after the end of each fiscal year" and (ii) " 'Net Profits' or 'Net Losses' of the Partnership for a Fiscal Period[.]" (Ex. C, at 5, 11.)

15. Several years after the Fund's inception, on February 21, 2013, it was revealed by the United States Attorney for the Western District of North Carolina (the "U.S. Attorney") that Maiden had been operating the Fund as a fraudulent scheme by, in part, "routinely transmitt[ing] bogus account statements to victims and to Maiden Capital's fund administrator [i.e., SS&C] which falsely reported favorable returns both monthly and from the [F]und's inception" in order to hide a series of failed investments. (Ex. J ¶ 4, ECF No. 347.10; *see also* Ex. W, at 14:18–15:3, ECF No. 347.23.)

16. The U.S. Attorney further revealed that by February 2009 Maiden had "lost a substantial amount of all investor funds in a series of failed investments," (Ex. J. ¶ 3), and that Maiden continued thereafter to operate the Fund "and tried to recover from the failed investments[,]" (Ex. J ¶ 5). Maiden's efforts were unsuccessful, and by July 2012, the Fund was insolvent. (Ex. J ¶ 5.) Maiden later admitted that he "was lying to SS&C" throughout the course of the fraud and that he knew his manipulation would cause SS&C to report false returns to the Fund's

investors. (Ex. O, at 866:24–69:11, 1225:17–22, ECF No. 347.15.) The U.S. Attorney calculated investor losses to be at least $8.9 million. (Ex. J ¶ 7.)

## II.

## PROCEDURAL HISTORY

17. Plaintiffs filed the Complaint initiating this action on August 7, 2014, asserting claims against (i) Maiden and Maiden Capital for fraud, constructive fraud, primary securities fraud liability under the North Carolina Securities Act ("NCSA"), civil liability pursuant to N.C.G.S. § 1-538.2, and conversion; (ii) SS&C for gross negligence, grossly negligent misrepresentation, aiding and abetting constructive fraud, aiding and abetting common law fraud, breach of fiduciary duty, and secondary securities fraud liability under N.C.G.S. § 78A-56(c)(2); and (iii) all Defendants for civil conspiracy and punitive damages. (Compl., ECF No. 1.)

18. SS&C filed a Motion to Dismiss Plaintiffs' Complaint ("Motion to Dismiss") on November 10, 2014. (ECF No. 15.) Shortly thereafter, on November 25, 2014, Plaintiffs filed an Amended Complaint, although Plaintiffs' claims against Maiden, Maiden Capital, and SS&C remained unchanged. (Am. Compl., ECF No. 30.)

19. After the Motion to Dismiss was fully briefed and heard, the Court granted the Motion to Dismiss in part, dismissing Plaintiffs' claims against SS&C for aiding and abetting common law fraud and breach of fiduciary duty. The Court also denied the Motion to Dismiss in part, permitting Plaintiffs' claims to proceed against SS&C for aiding and abetting constructive fraud, securities fraud, civil

conspiracy, as well as Plaintiffs' demand for punitive damages. *See Bradshaw v. Maiden*, 2015 NCBC LEXIS 80, at \*48 (N.C. Super. Ct. Aug. 10, 2015).

20. Specifically as to Plaintiffs' claim against SS&C for gross negligence, the Court held that the Motion to Dismiss "should be granted insofar as Plaintiffs' claim[s] [are] based on allegations that SS&C *should have known* of Maiden's fraud through inspection and verification of the Fund's books and records and other purported 'red flags[.]' " *Id.* at \*23–24 (emphasis added). The Court permitted the claim against SS&C to proceed only

> based on allegations that SS&C knowingly and willfully disseminated false and inaccurate information to Plaintiffs, knowingly and willfully failed to utilize GAAP and/or other applicable accounting standards required of SS&C under the ASA in preparing the financial information SS&C provided to Plaintiffs, knowingly and willfully manipulated the Fund's accounting, and all other willful and knowing acts Plaintiffs plead that were in violation of SS&C's duties under the ASA and applicable law.

*Id.* at \*24. Plaintiffs' gross negligence claim against SS&C was otherwise dismissed. *Id.* at \*23–24.

21. The Court also declined to dismiss Plaintiffs' claim against SS&C for grossly negligent misrepresentation, but did so "without prejudice to revisit the claim by later motion practice[,]" and permitted the claim to proceed to discovery specifically on Plaintiffs' allegations that "SS&C's conduct was wanton and willful, . . . that SS&C knowingly provided Capital Statements to Plaintiffs that SS&C knew contained false and inaccurate information and otherwise concealed the Fund's alleged fraud[.]" *Id.* at \*27–28 (citations omitted).

22.     After the close of discovery, SS&C filed the current Motion. The Motion has been fully briefed, and the Court heard arguments on the Motion at the hearing held by videoconference on June 18, 2020 (the "Hearing"), at which Plaintiffs and SS&C were represented by counsel.

23.     The Motion is now ripe for resolution.

III.

LEGAL STANDARD

24.     "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.' " *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680, 821 S.E.2d 360, 366 (2018) (quoting N.C. R. Civ. P. 56(c)). "[T]he party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact." *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985).

25.     The party moving for summary judgment may satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000) (citations omitted). "If the moving party satisfies its burden of proof, then the burden shifts to the non-moving party to 'set forth specific facts

showing that there is a genuine issue for trial[.]' " *Lowe v. Bradford*, 305 N.C. 366, 369–70, 289 S.E.2d 363, 366 (1982)) (quoting N.C. R. Civ. P. 56(e)). A genuine issue is "one which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534, 180 S.E.2d 823, 830 (1971). If the nonmoving party does not satisfy its burden, then "summary judgment, if appropriate, shall be entered against [the nonmovant]." *United Cmty. Bank (Ga.) v. Wolfe*, 369 N.C. 555, 558, 799 S.E.2d 269, 271 (2017) (quoting N.C. R. Civ. P. 56(e)).

26. In determining whether the nonmoving party has satisfied its burden, the Court "asks whether reasonable jurors could find by a preponderance of the evidence that the [nonmovant] is entitled to a verdict[.]" *Sloan v. Miller Bldg. Corp.*, 119 N.C. App. 162, 165–66, 458 S.E.2d 30, 32 (1995)). In making this determination, "[t]he evidence must be considered 'in a light most favorable to the non-moving party.' " *McCutchen v. McCutchen*, 360 N.C. 280, 286, 624 S.E.2d 620, 625 (2006) (quoting *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004).

IV.

ANALYSIS

A.   The Duty SS&C Owed to Plaintiffs

27. The Court has previously summarized Plaintiffs' key allegations:

Plaintiffs . . . allege that SS&C breached [a] duty of care [to Plaintiffs] by engaging in two different and broadly-identified types of conduct: first, that SS&C engaged in conduct that SS&C *did not actually know* — but should have known in the exercise of reasonable diligence — would cause injury to Plaintiffs, and second, that SS&C *knowingly*

engaged in conduct that Plaintiffs allege SS&C *knew* was in conscious disregard of the rights and safety of Plaintiffs.

*Bradshaw*, 2015 NCBC LEXIS 80, at *15 (emphasis added). The Court granted SS&C's Motion to Dismiss as to the first category of alleged conduct but allowed the second to proceed to discovery. *Id.* at *23–24. Plaintiffs must now satisfy their summary judgment burden with evidence supporting the second category, their contention that SS&C "knowingly and willfully" violated a duty to Plaintiffs "under the ASA and applicable law." *Id.* at *24.

28. In resolving the Motion to Dismiss, the Court concluded that "the duty of care SS&C owed to Plaintiffs under North Carolina law in the circumstances of this case is largely—but not completely—constrained and limited by the terms of SS&C's contract with the Fund." *Id.* at *17. The Court further concluded that SS&C's duty of care is not completely limited by the ASA because North Carolina law recognizes that

> [a] duty . . . may arise generally by operation of law under application of the basic rule of the common law which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to endanger the person or property of others.

*Pinnix v. Toomey*, 242 N.C. 358, 362, 87 S.E.2d 893, 897 (1955). In this sense, the Court concluded that the duty SS&C owed to Plaintiffs was narrow.

29. While the Court concluded that SS&C "[could not] escape a duty to refrain from forwarding information to investors like Plaintiffs that it knew was false or inaccurate[,]" *Bradshaw*, 2015 NCBC LEXIS 80, at *21, the Court held that, under the ASA, "SS&C did not have an obligation to verify the accuracy of the documents

and records provided to it by Management or serve as the Fund's outside accountant or auditor[,]" *id.* at *18; (*see also* ASA 1). Additionally, the Court concluded that SS&C was not required to affirmatively seek and acquire accurate information regarding the Fund's investments: as provided in the ASA, "SS&C's responsibility for maintaining the Fund's record of transactions was 'based on the information supplied' to it, and the books and records described in the services to be performed by SS&C were to be 'based on the information SS&C receive[d] from the Fund or its Management[.]' " *Id.* at *18 (quoting ASA 1).

30. The Court further found that the ASA restricted the duty that SS&C owed to Plaintiffs by specifically providing that "SS&C will not maintain custody of any cash or securities, will not have the authority to enter into contracts on behalf of the Fund, or any related party, [and] will not be responsible for determining the valuation of the Fund's investments[.]" *Id.* at *18 (quoting ASA 1). Indeed, SS&C was not allowed under the ASA to "perform any Management functions or make any Management decisions with regard to the operation of the Fund." *Id.* at *19 (quoting ASA 1).

31. In short, "[b]ased on the terms of the ASA, . . . [the Court found that] SS&C contracted away any obligation to provide investment, accounting, and auditing functions for the Fund other than as specifically provided in the ASA." *Id.* at *19.

32. With these points in mind, the Court reviews the evidence Plaintiffs have advanced in support of their gross negligence claim against SS&C.

B.    Gross Negligence

33.    The term "gross negligence" has been used interchangeably with "willful and wanton conduct" by North Carolina courts. *Yancey v. Lea*, 354 N.C. 48, 52, 550 S.E.2d 155, 157 (2001).    Specifically, "gross negligence" is defined "as wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Davis v. Hulsing Enters., LLC*, 370 N.C. 455, 460, 810 S.E.2d 203, 207 (2018) (quoting *Yancey*, 354 N.C. at 52, 550 S.E.2d at 157) (internal quotation marks omitted).    An act is wanton "when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *Yancey*, 354 N.C. at 52, 550 S.E.2d at 157 (quoting *Foster v. Hyman*, 197 N.C. 189, 191, 148 S.E. 36, 37–38 (1929)).    An act is done willfully "when it is done purposely and deliberately in violation of law or when it is done knowingly and of set purpose[.]" *Foster*, 197 N.C. at 191, 148 S.E. at 37.

34.    To be sure, "the difference between ordinary negligence and gross negligence is substantial." *Yancey*, 354 N.C. at 53, 550 S.E.2d at 158. "Negligence, a failure to use due care, *be it slight or extreme*, connotes inadvertence. Wantonness, on the other hand, connotes *intentional wrongdoing*." *Id.* (quoting *Hinson v. Dawson*, 244 N.C. 23, 28, 92 S.E.2d 393, 396–97 (1956)).    Conduct rises to the level of gross negligence "when the *act* is done purposely and with knowledge that such act is a breach of duty to others, i.e., a *conscious* disregard of the safety of others." *Id.*

35. As has been made clear in other jurisdictions, "a plausible allegation of *constructive* knowledge 'is insufficient, standing alone, to present a jury issue on gross negligence[,]' " since "to plausibly allege a claim for gross negligence . . . , the complaint must allege *deliberate* conduct by the defendants." *Reid v. Newton*, Action No. 3:13-CV-572, 2014 U.S. Dist. LEXIS 52072, at *21 (E.D. Va. Apr. 14, 2014) (emphasis added) (quoting *City of Lynchburg v. Brown*, 613 S.E.2d 407, 410 (Va. 2005)); *see also Komornik v. Sparks*, 629 A.2d 721, 724 (Md. 1993) ("[B]y 'actual knowledge,' we [do] not mean constructive knowledge, and . . . by 'conscious or deliberate disregard,' we [do] not mean 'negligence alone, no matter how gross, wanton, or outrageous.' " (citation omitted) (quoting *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 654 (Md. 1992))). While the Court's research has not uncovered an identical determination by North Carolina's appellate courts, the Court finds these cases persuasive and concludes that our Supreme Court would reach a similar conclusion should this same issue be presented for decision.

36. Turning then to Plaintiffs' contentions, Plaintiffs first purport to assert a claim for mere negligence against SS&C, insisting that they need not prove gross negligence to succeed. Although Plaintiffs never pleaded a separate negligence claim against SS&C, they argue that the elements of a negligence claim must be met before the higher gross negligence standard may be satisfied. And since the elements of gross negligence were pleaded in the Amended Complaint, Plaintiffs contend that the elements of negligence were impliedly pleaded as well. (Pls.' Br.

Opp'n Def. SS&C Technologies, Inc.'s Mot. Summ. J. 17–20 [hereinafter "Br. Opp'n"], ECF No. 292.)

37. Plaintiffs are correct that "a claim for gross negligence requires that plaintiff plead facts on each of the elements of negligence, including duty, causation, proximate cause, and damages." *Toomer v. Garrett*, 155 N.C. App. 462, 482, 574 S.E.2d 76, 92 (2002). However, Plaintiffs pleaded facts relating to these elements only in support of Plaintiffs' claim against SS&C for gross negligence. Plaintiffs did not plead a separate claim against SS&C for negligence. And, contrary to Plaintiffs' suggestion in its briefing, the Court has never said or implied that Plaintiffs pleaded a negligence claim in this action. While the Court stated in an attorneys' fees ruling that "Plaintiffs filed this lawsuit alleging that the information SS&C provided about the Fund was unsupported and false and thus that SS&C's conduct in providing such information was negligent[,]" the Court's statement related to Plaintiffs' gross negligence claim against SS&C, not to any unpleaded but implied claim for negligence. *Bradshaw v. Maiden*, 2018 NCBC LEXIS 98, at *3 (N.C. Super. Ct. Sept. 20, 2018).

38. Even under North Carolina's generous standards of notice pleading, *see* N.C. R. Civ. P. 8(a), the Amended Complaint cannot be read to assert a *separate* claim against SS&C for negligence that provided the required notice to SS&C that Plaintiffs sought to hold it liable for mere negligence, *see Estate of Savino v. Charlotte-Mecklenburg Hosp. Auth.*, 262 N.C. App. 526, 541, 822 S.E.2d 565, 576 (2018) ("[O]ur [c]ourts have refused to allow plaintiffs to assert negligence claims

not pleaded in the complaint, holding that 'pleadings have a binding effect as to the underlying theory of plaintiff's negligence claim.' " (quoting *Anderson v. Assimos*, 356 N.C. 415, 417, 572 S.E.2d 101, 102 (2002))); *see also Bruni v. Alger*, Case No. ST-16-CV-639, 2019 V.I. LEXIS 65, at *8 (V.I. Super. Ct. June 21, 2019) ("Th[e] definition of gross negligence as wanton, reckless behavior—different in quality rather than degree from ordinary negligence—renders gross negligence an independent claim. Thus, negligence and gross negligence must be pled under separate counts.").

39. In any event, the Court has already dismissed Plaintiffs' gross negligence claim as to what SS&C "should have known" about Maiden's fraud. *Bradshaw*, 2015 NCBC LEXIS 80, at *23–24. Plaintiffs may not now contend that they had another similar but distinct claim against SS&C all along. *See, e.g., Valentine Props. Assocs., LP v. U.S. Dep't of Hous. & Urban Dev.*, 785 F. Supp. 2d 357, 370 (S.D.N.Y. 2011) ("[A] brief opposing a dispositive motion is not the appropriate means of seeking to revive previously dismissed claims."); *West v. U.S. Sec'y of Transp.*, Case No. C06-5516 RBL, 2007 U.S. Dist. LEXIS 47727, at *3 (W.D. Wash. July 2, 2007) ("Plaintiff may not attempt to revive claims that have been dismissed[.]")[1]

40. The Court now turns to Plaintiffs' gross negligence claim itself. To support that claim against SS&C, Plaintiffs allege in their Amended Complaint that "SS&C

---

[1] It is worth noting that the ASA excluded SS&C's liability to the Fund and Management for negligence claims, expressly providing that "SS&C shall not be liable to the Fund or Management except for damages finally determined by a court of competent jurisdiction to have resulted directly from the gross negligence, willful misconduct, or bad faith of SS&C." (ASA 6.)

knowingly provided information concerning the Fund to Plaintiffs and the Fund's tax preparer *that SS&C knew was false* and contrary to third-party feeds and other information in SS&C's possession." *Bradshaw*, 2015 NCBC LEXIS 80, at *22 (emphasis added) (citing Am. Compl. ¶ 276–77). Furthermore, as to SS&C's alleged wanton and willful conduct, Plaintiffs have asserted that SS&C

(i) acted purposely and with knowledge that Plaintiffs would rely on the false financial information SS&C circulated to Plaintiffs;

(ii) failed "to properly perform its accounting services for the Fund in accordance with GAAP and other applicable accounting standards," and misrepresented the results of that accounting through SS&C's Capital Statements;

(iii) continued to issue Capital Statements to Plaintiffs "despite the fact it knew the Fund's books and records were inaccurate and were not compliant with GAAP [and] that Maiden could not produce evidential matter to support purported Fund investments," so that SS&C could continue collecting "wildly inflated fees based on phony AUM representations;" and

(iv) purposely manipulated the Fund's accounting to create a false impression to Plaintiffs that the Fund was "solvent, liquid, profitable and stable."

*Bradshaw*, 2015 NCBC LEXIS 80, at *22–23 (quoting Am. Compl. ¶¶ 270, 275–79). The Court focuses below, as do the parties, on these four assertions in assessing whether there is evidence that SS&C engaged in wanton and willful misconduct.

41. SS&C argues that Plaintiffs have failed to come forward with any evidence that SS&C actually knew about Maiden's fraud. (Mem. Law Supp. Def. SS&C Technologies, Inc.'s Mot. Summ. J. 15–17 [hereinafter "Mem. Supp."], ECF No. 257.) In particular, SS&C points to the lack of communications between Maiden and SS&C about the reporting of false information, the lack of internal documents in

which any SS&C employees acknowledged that the Fund or Maiden's information regarding the Fund was false or inaccurate, and the lack of any other evidence showing that SS&C was aware that Maiden was lying or providing false information to it when SS&C was performing its services. (Mem. Supp. 15.)

42. For the reasons that follow, the Court agrees with SS&C. Plaintiffs have not produced evidence that SS&C knew of Maiden's fraud or that any information he provided to SS&C or that SS&C provided to Plaintiffs was false or inaccurate. They have thus failed to adequately support their remaining ground to contend that SS&C engaged in grossly negligent misconduct. Therefore, Plaintiffs have not met their burden to show that there is a genuine issue of material fact with regard to their claim that SS&C engaged in grossly negligent misconduct and that claim against SS&C shall be dismissed.

a. <u>Acting with Knowledge that Plaintiffs Would Rely on False Information</u>

43. First, Plaintiffs have provided no evidence that SS&C knew the Fund's books and records were inaccurate or that Maiden was unable to support his purported investments with legitimate documentation. To reiterate the Court's earlier conclusion, "any duty SS&C owed to Plaintiffs did not include a duty to inspect the records or verify the accuracy of the information provided by [Maiden] or to provide independent accounting services to the Fund that were not specifically required of SS&C in the ASA." *Bradshaw*, 2015 NCBC LEXIS 80, at *19; *see also id.* at *18 ("SS&C's responsibility for maintaining the Fund's record of transactions was 'based on the information supplied' to it[.]" (quoting ASA 1)). Accordingly, it is

Plaintiffs' burden to demonstrate that SS&C in fact discovered that Maiden provided SS&C with false financial information during its administration of the Fund.

44. And yet, Plaintiffs continue to argue that SS&C's failure to thoroughly document Maiden's investments is enough to permit a factfinder to conclude that SS&C knew of Maiden's fraud. Indeed, citations to alleged instances of SS&C's failure to document investment transactions constitute the majority of Plaintiffs' factual background in their opposition brief. (*See* Br. Opp'n 8–11, 15–17.)

45. This evidence has no bearing on whether SS&C violated its duty "to refrain from forwarding information to investors like Plaintiffs that it *knew* was false or inaccurate[,]" *Bradshaw*, 2015 NCBC LEXIS 80, at *21 (emphasis added), since SS&C had no duty to verify the accuracy of the Fund's investments under the ASA, *id.* at *19. Indeed, the fact that SS&C did not (and was not required to) engage in due diligence cuts against Plaintiffs' argument. The limited amount of investment documentation Maiden shared with SS&C makes it *even more likely* that SS&C never became aware of Maiden's fraud.

46. Plaintiffs cite the following evidence in support of their allegation that SS&C knew of Maiden's fraud:

- SS&C knew that Maiden funneled hundreds of thousands of dollars from the Fund's brokerage account to Maiden's Bank of America account, which Maiden claimed was being used for legitimate Fund-

related purposes (Ex. 18, ECF No. 311; Ex. 19, ECF No. 312; Ex. 20, ECF No. 313);

- SS&C recorded millions of dollars of Fund assets at zero cost, as if Maiden acquired such assets for free, (Ex. 27, ECF No. 320);

- SS&C flipped the applicable cost of public shares to private shares in order to account for a corresponding cash flow of previously purchased stock, (Ex. 28, ECF No. 321);

- SS&C recorded an unrealized gain for a private company with shares owned by the Fund based on a reverse stock split of a similarly named public company, (Ex. 29, ECF No. 322; Ex. 30, ECF No. 323); and

- SS&C changed investment multiples to increase the value of a private investment held by the Fund, (Ex. 31, ECF No. 324).

47. Despite Plaintiffs' contentions, none of this evidence, singly or collectively, permits the conclusion that SS&C knowingly and willfully provided false information to Plaintiffs or knowingly and willfully participated in Maiden's fraud. While Plaintiffs have shown that SS&C created Capital Statements containing false information concerning the Fund's investments and their value, Maiden—and Maiden alone—bore sole responsibility under the ASA and the Offering Documents for attesting to those investments and calculating their value. *See Bradshaw*, 2015 NCBC LEXIS 80, at \*36 ("[T]he ASA required SS&C to make its calculations of the Fund's value based solely on the data provided to it by the Fund, and the Offering Documents make clear that Maiden had sole responsibility for determining the

value of the Fund's investments." (citing ASA 1–2)). And there is simply no evidence from which a factfinder could reasonably find that SS&C knew that any of the information it received from Maiden and included in the Capital Statements was false.

48. For example, Maryanne Lawson Niedfeld, the SS&C manager assigned to the Fund account, consistently testified that she made her decisions in recording Fund transactions based on the information given to her by Maiden and that she never suspected that Maiden's proffered information was false. (*See* Niedfeld Dep. 136:11–37:22, 167:9–17, 169:8–21, 177:13–78:4, 218:11–19:9, 311:22–12:4, 316:23–17:21, 321:25–24:12.) In fact, almost all the actions taken by SS&C and cited by Plaintiffs were taken after email conversations between Niedfeld and Maiden during which Maiden explained to Niedfeld why he claimed such actions were necessary. (*See* Ex. 18; Ex. 19; Ex. 20; Ex. 27; Ex. 28; Ex. 31.)[2]

49. As to the single occasion when Niedfeld acted without consulting Maiden, (Ex. 29; Ex. 30), Plaintiffs' evidence shows only that Niedfeld made a mistake when she recorded a reduction in the cost of KIT Media SPIV holdings by a factor of 35 when similarly named KIT Digital announced a 1-for-35 reverse stock split, not that she knew or believed Maiden had provided SS&C false information or was perpetrating a fraud on Plaintiffs, (*see* Niedfeld Dep. 292:19–94:12). Further, there is no evidence that Niedfeld's mistake had any impact on the information contained in the Capital Statements that were sent to Plaintiffs. (Niedfeld Dep. 296:9–97:2

---

[2] Plaintiffs do not explain why SS&C needed Maiden to provide such explanations if SS&C knew of and was a part of Maiden's fraud.

("The capital statements would show the net of the two so that there wouldn't be any impact[.]"); Exs. X through DD Reply Mem. Law Further Supp. Def. SS&C Technologies, Inc.'s Mot. Summ. J. Ex. AA, at 292:19–98:8, 327:23–28:20, ECF No. 282.1.)

50.    Plaintiffs also cite for support an email conversation between Maiden and Loren Locke ("Locke"), an SS&C accountant, regarding investment documentation sought by Locke.   Locke asked Maiden for "finalized documents for [Maiden's] restricted investments" such as "certificates or finalized docs showing ownership." (Ex. 33, at SSC-0074310, ECF No. 326.)  Maiden wrote that he would "track down some" and eventually sent Locke a fax of collected documents about a month after the email conversation.  (Ex. 33, at SSC-0074309, SSC-0026685.)  Plaintiffs argue that this email exchange permits the conclusion that SS&C knew it had a duty to acquire further documentation, (*see* Br. Opp'n 15–17), avoiding their burden at this stage to offer evidence that SS&C had *actual knowledge* of Maiden's fraud.

51.    Regardless, the email exchange between Locke and Maiden does not establish that SS&C had a duty to acquire further documentation or that it knew of Maiden's fraud.  Locke testified, "We [did not] require [Maiden] to show us all the documentation. . . .  [I]t[ ] [was] his responsibility to tell us what[ ] [was] in his books and records.  And for us, I[ ] ask[ed] because I understand what goes through these audits."  (Locke Dep. 336:2–7; *see also* Locke Dep. 346:3–7 ("[H]e was[ ] [not] required to send anything over for us to close out a month-end.").)  The fact that one SS&C employee asked for additional documentation does not show that SS&C had a

duty to acquire additional documentation and—more importantly—it does not permit a reasonable factfinder to conclude that SS&C knew of Maiden's fraudulent activity. Rather, the undisputed evidence shows that his request for additional documentation was merely intended to fulfill SS&C's contractual obligation to "[c]oordinat[e] with the Fund's auditors in connection with the Fund's audit." (ASA 1.)

52. Contrary to Plaintiffs' characterization, the undisputed evidence of record suggests that during its administration of the Fund, SS&C simply followed Maiden's orders, fulfilled the requirements of the ASA, and made the occasional recording mistake, not that SS&C had knowledge of Maiden's fraud and knowingly provided false information to Plaintiffs. Plaintiffs have not explained how their alternative, more sinister reading of SS&C's actions is warranted or permitted by the record evidence.

53. And the more specific evidence offered by Plaintiffs to show SS&C's supposed knowledge and intent misses the mark. Indeed, Plaintiffs' argument that SS&C was aware of Maiden's fraud relies almost exclusively on the testimony of Plaintiffs' expert, Dr. Frank Buckless ("Buckless"), and not on evidence regarding the actual state of mind of SS&C's employees. (*See* Dep. Testimony Excerpts & Tr. Testimony, Dep. Frank Buckless 305:16–23, 308:6–10, 309:8–16, 310:19–23, 315:12–22, 378:12–80:18 [hereinafter "Buckless Dep."].) Plaintiffs similarly rely on the expert testimony of Joseph Belanger ("Belanger"). (*See* Dep. Testimony Excerpts & Tr. Testimony, Dep. Joseph P. Belanger 434:18–23, 435:19–36:3.)

54. But the Court cannot rely on this expert testimony to show that SS&C engaged in knowing and willful conduct. First, accounting experts like Buckless and Belanger cannot provide evidence of intent or state of mind because such opinions are plainly beyond their areas of competence. *See, e.g., Yates v. J. W. Campbell Electrical Corp.*, 95 N.C. App. 354, 360, 382 S.E.2d 860, 864 (1989) (rejecting engineering expert's testimony concerning defendant's state of mind as outside expert's competence); *see also, e.g., Siring v. Or. State Bd. of Higher Educ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) ("Courts routinely exclude as impermissible expert testimony as to intent, motive, or state of mind."); *Smith v. Wyeth-Ayerst Labs. Co.*, 278 F. Supp. 2d 684, 700 (W.D.N.C. 2003) ("[T]he jury should hear and/or see first-hand any relevant evidence pertaining to the [d]efendant's intent. Then the jury, not the witnesses, should consider the facts and make its own determination regarding [the d]efendant's intent."). As such, Plaintiffs' experts' opinions to this effect are inadmissible conjecture and speculation. *See, e.g., Young v. Hickory Bus. Furniture*, 353 N.C. 227, 231, 538 S.E.2d 912, 915 (2000) (rejecting expert testimony based "merely upon speculation and conjecture"). Moreover, our courts have made clear that "an expert may not testify as to whether a certain legal standard has been met[,]" *Norris v. Zambito*, 135 N.C. App. 288, 292, 520 S.E.2d 113, 115–16 (1999), and that is precisely what Plaintiffs seek to have Buckless and Belanger proffer here.

55. The undisputed evidence in this case shows that every SS&C employee who worked on the Fund testified that he or she was unaware Maiden had supplied

SS&C with false or fictitious information, and none expressed any concerns about the legitimacy of the Fund's financial information provided by Maiden or the veracity of Maiden's communications. (Ex. F, at 83:18–84:7; Ex. I, at 255:14–23; Ex. E, at 186:8–12, ECF No. 347.5; Ex. P, at 182:14–17, ECF No. 347.16.) Indeed, there is no evidence from any source that any SS&C employee believed that any of the transactions or valuations received from Maiden were false or revealed fraudulent conduct. Maiden himself testified that he lied to SS&C in order to further his fraud. (Ex. O, at 866:24–69:11, 1225:17–22.) Additionally, the ASA prevented SS&C from performing any management functions or making any management decisions; SS&C was only authorized to collect and compile information from Maiden. (*See* ASA 1.) Ultimately, Plaintiffs have only offered evidence of what they term "bogus accounting[,]" (Br. Opp'n 6), and the speculative testimony of experts as to SS&C's state of mind. The record is therefore devoid of competent evidence that SS&C knew about Maiden's misconduct.

56. In sum, the evidence of record, viewed in the light most favorable to Plaintiffs, does not permit a reasonable factfinder to conclude that SS&C discovered Maiden's fraud or knowingly submitted false information to Plaintiffs while it served as the Fund's administrator. *See, e.g., Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187, 835 S.E.2d 411, 415 (2019) (noting that the "[s]ubstantial evidence" required of a non-moving party to defeat a Rule 56 motion is "more than a scintilla or a permissible inference" (quoting *Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 335, 777 S.E.2d 272, 279 (2015))).

b.      Failing to Perform Accounting Services in Accordance with GAAP

57.     Plaintiffs have produced no evidence that SS&C failed to properly perform accounting services for the Fund.  While Plaintiffs argue that SS&C was required to use GAAP when preparing the Capital Statements for Plaintiffs, (Br. Opp'n 22–25), they have not established that SS&C was ever under such a legal duty.

58.     First, the ASA did not require SS&C to use GAAP; it is not mentioned anywhere in the document.  (*See* ASA.)  While the ASA requires SS&C to keep books, records, and statements to document Fund transactions, it does not require these tasks to be performed in accordance with GAAP or any other accounting standard.  (*See* ASA 2.)  In partially denying SS&C's Motion to Dismiss, the Court determined that Plaintiffs' gross negligence claim could go forward against SS&C on the allegation that SS&C "failed to utilize GAAP and/or other applicable accounting standards required of SS&C *under the ASA*[.]"  *Bradshaw*, 2015 NCBC LEXIS 80, at \*24 (emphasis added).  It is now apparent that no such standard was ever required by the ASA.

59.     Plaintiffs again rely on Buckless, who asserted that GAAP is the standard of care to which SS&C was subjected when it administered the Fund under the ASA, that SS&C had an obligation to collect documentation, and that SS&C was required to verify the accuracy of Maiden's investment-related assertions.  (*See* Buckless Dep. 217:22–18:22, 229:11–23, 231:9–14, 235:23–36:4, 236:24–37:17, 289:10–15, 289:21–90:2.)  However, Buckless's testimony rests on his unwarranted assumption that SS&C was engaged in *accounting* work for the Fund.  (*See, e.g.*,

Buckless Dep. 218:20–22, 235:23–36:4, 250:3–7, 273:19–74:1, 289:10–90:8, 290:15–91:4, 292:15–18.) That assumption has no support in the evidence.

60. As noted, in the ASA, SS&C contracted away any obligation to perform accounting work for the Fund. *See Bradshaw*, 2015 NCBC LEXIS 80, at \*19. The ASA does not reference any accounting work to be done by SS&C, and the undisputed evidence of record shows that SS&C never performed accounting work for the Fund. Accounting is a "skilled profession embracing the matters described in G.S. 93-1(a)(5)," *Mastrom, Inc. v. Cont'l Cas. Co.*, 78 N.C. App. 483, 485, 337 S.E.2d 162, 164 (1985), and N.C.G.S. § 93-1(a)(5) describes "accountancy" as "involv[ing] the auditing or verification of financial transactions, books, accounts, or records, or the preparation, verification or certification of financial, accounting and related statements intended for publication[,]" N.C.G.S. § 93-1(a)(5). SS&C never directly engaged in the "auditing" or "verification" of the Fund's investments. The only work done by SS&C that arguably falls under this definition is the preparation of the Capital Statements, but those documents—by their own terms—were "preliminary, unaudited, and subject to change." (Ex. A.) In other words, they were not the products of an "audit[ ]" or "verification[,]" N.C.G.S. § 93-1(a)(5), and thus were not the products of accounting.

61. Plaintiffs point to instances where SS&C described its work as "accounting," including, for example, one of Locke's emails to Maiden. (Ex. 33, at SSC-0074309 ("I will have the accounting finalized[.]").) However, a company's subjective, perhaps offhanded description of its non-accounting work as

"accounting" does not transform that work into accounting work. Rather, the objective definition of "accountancy" in N.C.G.S. § 93-1(a)(5) controls, and the undisputed evidence shows that SS&C's work does not meet that definition here.

62. The only document provided to Plaintiffs that mentions GAAP or any accounting standard is the Partnership Agreement, and SS&C was never a party to the Partnership Agreement. (*See* Ex. C; Exs. X through DD Reply Mem. Law Further Supp. Def. SS&C Technologies, Inc.'s Mot. Summ. J. Ex. AA, at 103:12–25, Ex. DD, at 164:23–65:9.) Regardless, the Partnership Agreement only requires the use of GAAP during the production of audited financial statements and net profit and loss statements, the latter of which were to be produced by December 31 each fiscal period by auditors designated by Maiden Capital. (Ex. C, at 5, 11.) There is no evidence that the unaudited Capital Statements produced by SS&C are the audited financial statements or the net profit and loss statements contemplated by the Partnership Agreement. (*See* Ex. A (noting they were "preliminary, unaudited[,] and subject to change".) Indeed, the ASA does not obligate SS&C to document the Fund's books, records, and statements in any particular way. (*See* ASA.)

63. And in any event, Plaintiffs have not offered any evidence that SS&C knowingly and willfully ignored GAAP standards even if such standards applied. No SS&C employee testified that he or she believed that GAAP applied to SS&C's work for the Fund, (Exs. X through DD Reply Mem. Law Further Supp. Def. SS&C Technologies, Inc.'s Mot. Summ. J. Ex. AA, at 19:24–20:8, Ex. DD, at 164:23–65:9),

and Plaintiffs have produced no evidence that SS&C knew of any duty to apply GAAP and failed to do so, *see, e.g.*, *Yancey*, 354 N.C. at 53, 550 S.E.2d at 158 (holding that gross negligence requires an act "done purposely and with knowledge that such an act is a breach of duty to others").

64. In sum, Plaintiffs have produced no evidence either that SS&C had a duty to verify the Fund's investments in accordance with GAAP or any other formal accounting standard or that SS&C knowingly failed to do so.

c. <u>Issuing Capital Statements with Knowledge that the Fund's Books and Records Were Inaccurate</u>

65. As stated above, Plaintiffs have offered no evidence that SS&C knew that the Capital Statements were inaccurate. As a result, Plaintiffs' contention that "SS&C . . . collect[ed] wildly inflated fees based on phony AUM representations[,]" *Bradshaw*, 2015 NCBC LEXIS 80, at *23 (internal quotation marks omitted) (quoting Am. Compl. ¶ 276), is without evidentiary support.

d. <u>Purposefully Manipulating the Fund's Accounts</u>

66. Finally, there is no evidence that SS&C manipulated the Fund's financial information to make the Fund appear solvent when it was insolvent. Because there is no evidence that SS&C knowingly and willfully manipulated the Fund's financial information, knowingly relayed false information to Plaintiffs, or knowingly and willfully failed to properly perform services for the Fund under the ASA, Plaintiffs have failed to satisfy their burden of proof on this point as well.

67. Since Plaintiffs have offered no evidence that SS&C committed any knowing or willful act in violation of its duty to Plaintiffs, and, in particular,

because Plaintiffs have failed to offer substantial evidence that SS&C knew about or participated in Maiden's fraud, summary judgment shall be granted and Plaintiffs' gross negligence claim against SS&C shall be dismissed. *See Sawyer v. Food Lion, Inc.*, 144 N.C. App. 398, 403, 549 S.E.2d 867, 871 (2001) (affirming summary judgment on a gross negligence claim where conduct was "not willful"); *see also Trillium Ridge Condo. Ass'n v. Trillium Links & Vill., LLC*, 236 N.C. App. 478, 491, 764 S.E.2d 203, 212 (2014) ("[G]iven Plaintiff's failure to identify any act or omission on the part of Trillium Links that was done with conscious or reckless disregard for the rights and safety of others, we conclude that the trial court did not err by granting summary judgment in favor of Trillium Links with respect to Plaintiff's gross negligence claim." (citation and internal quotation marks omitted)).

C.   Grossly Negligent Misrepresentation

68.   SS&C argues now, as it did in its Motion to Dismiss, that a claim for grossly negligent misrepresentation does not exist under North Carolina law and therefore Plaintiffs' purported claim against SS&C on this basis should be dismissed. (Mem. Supp. 17–18.)  Since the Court's ruling on SS&C's Motion to Dismiss, it appears that only one North Carolina court has addressed a purported grossly negligent misrepresentation claim. *See Krause v. RK Motors, LLC*, No. COA17-1168, 2018 N.C. App. LEXIS 631 (N.C. Ct. App. July 3, 2018).  In that case, the plaintiff brought a "negligent or grossly negligent misrepresentation" claim as opposed to a claim premised entirely on gross negligence. *Id.* at *2–3.  The Court of Appeals affirmed the dismissal of the claim at the summary judgment stage without

addressing whether a grossly negligent misrepresentation claim may be advanced under North Carolina law. *Id.* at \*9.

69. The Court now considers the viability of this claim against SS&C for the second time. In approaching this task, the Court is mindful that while it "[should] not shirk its duty to fully consider new causes of actions when they are properly presented[,]" *Woodell v. Pinehurst Surgical Clinic, P.A.*, 78 N.C. App. 230, 233, 336 S.E.2d 716, 718 (1985), *aff'd*, 316 N.C. 550, 342 S.E.2d 523 (1986), *overruled on other grounds by Johnson v. Ruark Obstetrics*, 327 N.C. 283, 300–01, 395 S.E.2d 85, 95 (1990), it "[should] proceed with the utmost caution and deliberateness in the face of such a request[,]" *Hester v. Hubert Vester Ford, Inc.*, 239 N.C. App. 22, 31, 767 S.E.2d 129, 137 (2015).

70. Heeding these admonitions here, the Court concludes that because the Court of Appeals did not comment on the viability of the grossly negligent misrepresentation claim in *Krause*, the Court is not prepared to hold that the claim does not exist under North Carolina law as SS&C requests. Neither, however, is the Court prepared to hold that the North Carolina Supreme Court would recognize the claim if given the chance. The Court instead concludes it need not decide that issue on this Motion because, even if the claim is later found to exist, Plaintiffs' failure to offer evidence showing that SS&C engaged in "wanton and willful" misconduct, a necessary element of any such claim, and, separately, Plaintiffs' failure to respond to SS&C's arguments for dismissal of the claim, (*see* Br. Opp'n

19–20 (addressing only negligent misrepresentation, a claim they did not plead)), require dismissal of the claim against SS&C under Rule 56.

D. Aiding and Abetting Constructive Fraud

71. SS&C argues that Plaintiffs' claim for aiding and abetting constructive fraud is likewise not recognized under North Carolina law and should therefore be dismissed. (Mem. Supp. 20.) This Court previously recognized in its ruling on SS&C's motion to dismiss that should such a claim exist, it would be "similar to a claim for aiding and abetting breach of fiduciary duty." *Bradshaw*, 2015 NCBC LEXIS 80, *39. Since the Court's decision, the North Carolina Court of Appeals has refused to recognize a claim for aiding and abetting a breach of fiduciary duty. *See BDM Invs. v. Lenhil, Inc.*, 826 S.E.2d 746, 763 (N.C. Ct. App. 2019) ("[T]he North Carolina Supreme Court has not recognized a cause of action for aiding and abetting breach of fiduciary duty, nor do we recognize it here.").

72. In light of the Court of Appeals' decision and given the similarity between the two aiding and abetting claims, the Court concludes that the North Carolina Supreme Court would not recognize a claim for aiding and abetting constructive fraud if the issue were presented for decision. The Court thus concludes that Plaintiffs' claim for aiding and abetting constructive fraud against SS&C should be dismissed.[3]

---

[3] The Court further concludes that should the claim be found to exist, Plaintiffs have failed to offer substantial evidence in support, including any evidence of SS&C's "actual, not implied, knowledge" of Maiden's fraud or of SS&C's "substantial assistance or encouragement" in facilitating Maiden's fraud. *Zloop, Inc. v. Parker Poe Adams & Bernstein, LLP*, 2018 NCBC LEXIS 16, at *34–53 (N.C. Super. Ct. Feb. 16, 2018) (citation and emphasis omitted), *aff'd*, 820 S.E.2d 322 (N.C. Ct. App. 2018).

E.    North Carolina Securities Act Fraud

73.    Plaintiffs have alleged a claim against SS&C for secondary liability under the NCSA for assisting Maiden in the implementation of his fraud.  This claim, too, must be dismissed.  Section 78A-56(c)(2) of the NCSA provides that "Every other person who *materially aids* in the transaction giving rise to the liability is also liable jointly and severally . . . if the . . . other person *actually knew* of the existence of the facts by reason of which the liability is alleged to exist."  N.C.G.S. § 78A-56(c)(2) (emphasis added); *see also NNN Durham Office Portfolio 1, LLC v. Grubb & Ellis Co.*, 2016 NCBC LEXIS 95, at *90–91 (N.C. Super. Ct. Dec. 5, 2016) ("The Securities Act imposes two essential elements for secondary liability: (1) the 'material aid' requirement, and (2) the 'actual knowledge' requirement.").  In other words, "under the Securities Act, . . . material aid . . . must . . . be accompanied by proof that the party charged with secondary liability acted with knowledge of the facts on which the claim of primary liability is based."  *NNN Durham Office Portfolio 1*, 2016 NCBC LEXIS 95, at *92.

74.    SS&C argues that Plaintiffs' claim for secondary liability under the NCSA fails because Plaintiffs have presented no evidence that SS&C had actual knowledge of Maiden's misconduct.  (Mem. Supp. 21.)  The Court agrees, as discussed at length above.  Absent such knowledge, SS&C cannot be held secondarily liable for assisting Maiden's fraud under the NCSA.  Plaintiffs' NCSA claim against SS&C should therefore be dismissed.

F.    Civil Conspiracy

75.    Recognizing that civil conspiracy is not a separate, standalone cause of action, SS&C argues that Plaintiffs' civil conspiracy claim against SS&C should be dismissed because Plaintiffs have failed to satisfy their burden to sustain their other claims.   (Mem. Supp. 22.)   The Court agrees.   Because the Court has dismissed all of Plaintiffs' underlying claims against SS&C, the Court must likewise dismiss Plaintiffs' claim against SS&C for civil conspiracy.  *See Piraino Bros., LLC v. Atl. Fin. Grp., Inc.*, 211 N.C. App. 343, 350, 712 S.E.2d 328, 333–34 (2011) ("Where this Court has found summary judgment for the defendants on the underlying tort claims to be proper, we have held that a plaintiff's claim for civil conspiracy must also fail.").

76.    Even if any of Plaintiffs' underlying claims against SS&C could survive dismissal under Rule 56, the Court further concludes that the civil conspiracy claim against SS&C would necessarily fail because Plaintiffs have offered no evidence in support.  "A civil conspiracy requires: (1) an *agreement* between two or more persons to do a wrongful act; (2) an overt act committed in furtherance of the agreement; and (3) damage to the plaintiff."  *Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C. App. 650, 657, 464 S.E.2d 47, 54 (1995) (emphasis added).   While "[d]irect evidence of a conspiracy agreement is not necessary and often does not exist[,]" *id.* at 657, 464 S.E.2d at 54, "the evidence of the agreement must be sufficient to create more than a suspicion or conjecture in order to justify submission of the issue to a jury[,]" *Dickens v. Puryear*, 302 N.C. 437, 456, 276 S.E.2d 325, 337 (1981); *see also*

*Se. Anesthesiology Consultants, PLLC v. Rose*, 2019 NCBC LEXIS 52, at *41 (N.C. Super. Ct. Aug. 20, 2019) (holding that dismissal was proper where the conspiracy claim "fail[ed] to allege how th[e] conspiracy came to be, or when, or where, or why" (quoting *Bottom v. Bailey*, 238 N.C. App. 202, 213, 767 S.E.2d 883, 890 (2014)).

77.     Plaintiffs offer no evidence of how, when, where, or why a conspiracy between SS&C and Maiden arose.  Instead, they rely solely on what they describe as "manipulated accounting and . . . incriminating email trails."  (Br. Opp'n 28.) The Court has discussed at length above how this evidence merely demonstrates that Maiden knowingly provided false financial information to SS&C.  This evidence does not show that SS&C knew of Maiden's financial misconduct, much less that SS&C agreed to participate or in fact participated in Maiden's fraud. Therefore, based on the lack of supporting evidence, Plaintiffs' civil conspiracy claim against SS&C cannot survive summary judgment and shall be dismissed.

G.     Punitive Damages

78.     Plaintiffs cannot assert a claim for punitive damages against SS&C where, as here, their substantive claims against SS&C have been dismissed.  When a court has "dismissed all of [the] plaintiff's substantive claims, [the plaintiff] is precluded from recovering punitive damages since, '[a]s a rule[,] you cannot have a cause of action for punitive damages by itself.' "  *Horne v. Cumberland Cty. Hosp. Sys.*, 228 N.C. App. 142, 150, 746 S.E.2d 13, 20 (2013) (quoting *Oestreicher v. Am. Nat'l Stores, Inc.*, 290 N.C. 118, 134, 225 S.E.2d 797, 808 (1976)).

79. Even if any of Plaintiffs' substantive claims against SS&C were deemed to survive, punitive damages would nonetheless be unavailable to Plaintiffs because they have not offered evidence of a necessary aggravating factor. *See Scarborough v. Dillard's, Inc.*, 363 N.C. 715, 720, 693 S.E.2d 640, 643 (2009) (holding that to obtain an award of punitive damages, "one of the following aggravating factors [must be] present and [be] related to the injury for which compensatory damages were awarded: (1) [f]raud[,] (2) [m]alice[, or] (3) [w]illful or wanton conduct" (quoting N.C.G.S. § 1D-15(a))); *see also Justice v. Greyhound Lines, Inc.*, No. 5:16-CV-132-FL, 2018 U.S. Dist. LEXIS 54285, at *12–13 (E.D.N.C. Mar. 30, 2018) (under North Carolina law, "willful or wanton conduct is 'more' than gross negligence in the sense that willful or wanton conduct requires, in addition to breach of a known duty, an aggravating factor.").

80. Because Plaintiffs offer no evidence in support of their allegation that SS&C knew of Maiden's fraud and knowingly submitted false information to Plaintiffs, they have failed to show that punitive damages against SS&C are warranted. *See, e.g., Braswell v. Colonial Pipeline Co.*, 395 F. Supp. 3d 641, 656 (M.D.N.C. 2019) ("[A party's] failure to allege sufficient facts in support of [its] gross negligence claim dooms [its] punitive damages claim."). Plaintiffs shall thus be precluded from recovering punitive damages against SS&C on this separate and independent basis.

V.

CONCLUSION

81.   **WHEREFORE**, based on the foregoing, the Court hereby **GRANTS** SS&C's Motion and **ORDERS** that all of Plaintiffs' remaining claims against SS&C in this action are hereby **DISMISSED with prejudice**.

**SO ORDERED**, this the 15th day of September, 2020.


/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge